SNEAD v JOHN CARLO, INC

SNEAD v DEPARTMENT OF TRANSPORTATION

Docket No. 298575. Submitted September 14, 2011, at Detroit. Decided October 18, 2011, at 9:10 a.m.

Tracy Snead brought an action in the Macomb Circuit Court against John Carlo, Inc., seeking damages for personal injuries and property damage sustained when she drove her vehicle into a large construction hole located in the roadbed of a highway exit lane. She claimed that Carlo negligently maintained the construction site. Snead amended her complaint to add a claim for personal protection insurance benefits against State Farm Insurance Company, the insurer of her vehicle. Snead also initiated a separate suit in the Court of Claims against the Michigan Department of Transportation (MDOT), alleging, in part, negligence for having barricaded the construction hole in a defective, unsafe, and confusing manner. A stipulated order for joinder was entered pursuant to which the Court of Claims ordered the joinder of the two actions and assigned the joined cases to the Macomb Circuit Court, with the circuit court having concurrent jurisdiction and sitting as the Court of Claims. The Court of Claims, Richard L. Caretti, J., determined that, under the totality of the circumstances, it was not clear that the area had been in fact closed to traffic and, therefore, it was not clear that MDOT's duty to maintain the highway under MCL 691.1402(1) had been suspended during the construction activities. The court held that Snead could pursue her claim under the highway exception to governmental immunity contained in the statute. The court then denied MDOT's motion for summary disposition and granted partial summary disposition in favor of Snead with regard to the applicability of the highway exception to governmental immunity. MDOT appealed.

The Court of Appeals *held*:

1. The statutory duty to maintain a highway creates a duty with respect to the traveled portion, paved or unpaved, of the roadbed actually designed for vehicular travel by the public. If the condition is not located in the actual roadbed designed for vehicular travel, the narrowly drawn highway exception is inapplicable and liability does not attach. Allegations concerning a lack of

warning and traffic-control devices, or allegations of design defects, do not by themselves implicate the highway exception and the government's duty to repair and maintain a highway.

2. The condition or hazard that must be examined in this case is the construction hole in the exit lane, which proximately caused the accident and any resulting damages. The roadbed of the exit lane is indisputably part of the improved portion of the highway designed for vehicular travel. Therefore, if the exit lane was effectively open for public travel and not closed as reflected by traffic-control devices, MDOT's duty to keep the exit lane reasonably safe for public travel would be implicated.

3. The construction activities, in and of themselves, do not support a conclusion that the exit lane was closed. The appropriate test for determining whether a road is open for public travel is whether a reasonable motorist, under all the circumstances, would believe that the road was open for travel. It would be nonsensical to conclude that a road was closed for public travel in circumstances in which a motorist had no notice that construction activities precluded the safe use of the road, making evasive action difficult or impossible.

4. The issue concerning traffic-control devices cannot be considered in isolation; rather, it affects the questions whether the exit lane was open for public travel and whether MDOT was negligent, both of which questions relate to the construction hole in the roadbed that was the direct proximate cause of the accident.

5. The duty to keep a highway in reasonable repair is suspended when the highway is effectively closed by authorities, while the duty is still owed if the highway, despite undergoing construction, is not properly closed to the public.

6. A genuine issue of material fact exists with respect to whether the exit lane was effectively open for public travel at the time of the accident, as based on the observations of a reasonable motorist driving down the highway at the time. The trial court erred by granting partial summary disposition in favor of Snead on the basis that the highway exception applied as a matter of law. The applicability of the highway exception on remand will be dependent on the trier of fact's finding regarding whether the exit lane was closed or open for public travel. The part of the trial court's order that denied MDOT's motion for summary disposition is affirmed, the part of the order granting partial summary disposition in favor of Snead with respect to the applicability of the highway exception to governmental immunity is reversed, and the matter is remanded to the trial court for further proceedings consistent with the opinion of the Court of Appeals.

Affirmed in part, reversed in part, and remanded.

TALBOT, J., concurring, wrote separately to state that, while he concurs in the majority's ultimate ruling, it is unnecessary to suggest the existence of a new rule of law or test to reach this correct result. The trial court correctly identified that the primary issue is whether MDOT had closed the subject area of the highway. This determination simply comprises a question of fact and does not necessitate the construction or imposition of a reasonable-person test. The question whether the roadway was open or closed comprised a factual determination for the trier of fact.

1. GOVERNMENTAL IMMUNITY — HIGHWAY EXCEPTION — TRAFFIC-CONTROL DEVICES — DESIGN DEFECTS.

Allegations concerning a lack of warning and traffic-control devices or allegations of design defects do not by themselves implicate the highway exception to governmental immunity and the government's duty to repair and maintain a highway within its jurisdiction (MCL 691.1402[1]).

2. GOVERNMENTAL IMMUNITY — HIGHWAY EXCEPTION — OPEN FOR PUBLIC TRAVEL.

The appropriate test for determining whether a highway is open for public travel for purposes of the highway exception to governmental immunity is whether under all the circumstances a reasonable motorist traveling along the pertinent section of highway would believe that the highway was open for travel (MCL 691.1402[1]).

3. GOVERNMENTAL IMMUNITY — HIGHWAY EXCEPTION — HIGHWAY IMPROVEMENT AND REPAIR.

A governmental agency's duty to keep a highway under its jurisdiction in reasonable repair is suspended when the highway is effectively closed by authorities; the duty is still owed if the highway, despite undergoing construction, is not properly closed to the public (MCL 691.1402[1]).

*Daniel J. Flaggman* and *Eric D. Geller* for Tracy Snead.

*Ogne, Alberts & Stuart, P.C.* (by *Dennis D. Alberts*, Special Assistant Attorney General), for the Department of Transportation.

Before: MURPHY, C.J., and FITZGERALD and TALBOT, JJ.

MURPHY, C.J. Defendant Michigan Department of Transportation (MDOT) appeals the Court of Claims' order that denied its motion for summary disposition while granting partial summary disposition in favor of plaintiff with respect to the applicability of the highway exception to governmental immunity. This case arose out of a motor vehicle accident in which plaintiff drove her car into a large construction hole located in the roadbed of a highway exit lane, allegedly as a result of confusing and inadequate traffic-control devices. We conclude that the relevant condition or hazard for purposes of determining the applicability of the highway exception was the construction hole itself, which proximately caused the accident and any resulting damages. Furthermore, we find, as a matter of law, that the exit lane's roadbed where the construction hole was located constituted an improved portion of the highway and that the exit lane had been designed for vehicular traffic. We also conclude that a genuine issue of material fact exists regarding whether the exit lane was closed or effectively remained open for public travel at the time of the accident, as gleaned by a reasonable motorist traveling along the pertinent section of highway. Accordingly, we affirm the trial court's ruling that denied MDOT's motion for summary disposition but we reverse the court's determination that plaintiff was entitled to partial summary disposition with respect to the applicability of the highway exception to governmental immunity.

## I. FACTUAL AND PROCEDURAL HISTORY

In the early morning hours of April 21, 2007, plaintiff was operating her motor vehicle on eastbound I-94 when she entered the exit lane for westbound M-59/Hall Road and soon struck a large, unprotected construction

hole in the roadbed of the exit lane.[1] In January 2009, plaintiff initially filed suit in the Macomb Circuit Court solely against defendant John Carlo, Inc. (hereafter Carlo). Plaintiff alleged that Carlo was hired and delegated the task of construction and that Carlo was responsible for maintaining safe conditions at the construction site and for keeping the site reasonably safe and convenient for public travel. She contended that Carlo was negligent because it failed to properly and adequately maintain the construction site, failed to adequately design the site to allow for safe use of the exit lane, failed to adequately warn the public of the hazardous condition, failed to use reasonable care to make the site reasonably safe for foreseeable use by motorists attempting to exit the highway, erected unsafe and inadequate barricades, and failed to properly barricade the exit lane, thereby allowing traffic to enter what should have been a closed exit. Plaintiff maintained that she suffered a litany of injuries and incurred damages as a proximate result of Carlo's negligence.

A couple of weeks after filing the complaint, plaintiff filed a first amended complaint in the Macomb Circuit Court that retained the negligence claim against Carlo and added a first-party claim for personal protection insurance (PIP) benefits against defendant State Farm Insurance Company (hereafter State Farm), which was plaintiff's auto insurer.[2]

In February 2009, plaintiff initiated a separate suit against MDOT in the Court of Claims, alleging negli-

[1] The exit was actually comprised of three lanes of travel, at times referred to as "flare" lanes by the parties and the police, which transported motorists off the main highway. To avoid confusion and simplify matters, we shall refer to the roadway where the hole was located as the "exit lane" in the singular.

[2] The claims against Carlo and State Farm are not at issue in this appeal.

gence by MDOT for having barricaded the construction hole in a defective, unsafe, and confusing manner. Plaintiff claimed that the construction site was improperly and negligently constructed and maintained by MDOT, creating a point of hazard or special danger that uniquely affected vehicular traffic on the improved portion of the roadway to the extent that travel was rendered unsafe. Plaintiff additionally set forth allegations of negligence similar to those made against Carlo, along with a claim that MDOT negligently hired and failed to properly supervise Carlo.

In April 2009, a stipulated order for joinder was entered pursuant to which the Court of Claims, under MCL 600.6421,[3] ordered the joinder of the two actions and assigned the joined cases to the Macomb Circuit Court, with the circuit court "having concurrent jurisdiction and sitting as the Court of Claims."

In March 2010, MDOT filed a motion for summary disposition, arguing that plaintiff drove on the wrong side of orange construction barrels and into a portion of the road under construction. MDOT maintained that the construction activities clearly and undeniably entailed the exercise and discharge of a governmental function; therefore, it was immune from tort liability under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, and more specifically MCL 691.1407(1). MDOT contended that the highway exception to governmental immunity, MCL 691.1402, did not apply for the following two reasons: "(1) the accident

---

[3] MCL 600.6421 provides:

Cases in the court of claims may be joined for trial with cases arising out of the same transaction or series of transactions which are pending in any of the various trial courts of the state. A case in the court of claims shall be tried and determined by the judge even though the trial court action with which it may be joined is tried to a jury under the supervision of the same trial judge.

occurred on a closed portion of the road that was not intended for vehicular travel at the time as a result of the ongoing construction activities; and (2) Plaintiff's claims for negligent placement of barricades and other traffic control devices does not fit within the highway exception as a matter of law."

Plaintiff filed a response to the motion, arguing that she did not drive on the wrong side of the barrels and that the barrels were set up in such a manner so as to not clearly indicate a right or wrong side for vehicular travel. Plaintiff maintained that she and several other drivers drove where they were directed by the barrels, leading them into a construction hole dug across two of the three exit or flare lanes in the improved portion of the roadway.[4] Plaintiff argued that the highway exception to governmental immunity was thus fully applicable. Documentary evidence submitted by plaintiff showed that four vehicles, including plaintiff's car, took the exit lane that was under construction and struck the hole. Four separate crash reports indicated that the accidents occurred around the same time.[5] The crash reports further indicated that the vehicles struck or drove into the large hole in the roadway because of a confusing road-closure set up. In two of the reports, it was noted, "Investigation found barrels for construction confusing." A couple of the crash reports also stated that the county road commission was contacted

---

[4] It was a bit unclear from the record whether plaintiff wanted to take that particular exit to arrive at her desired destination, whether she had no such intent but felt that the barrels and barriers forced or directed her to leave the highway and enter the exit lane, or whether she wished to take the exit and thought that she was also compelled to exit the highway. There were several miles of highway in the area that were undergoing construction.

[5] The reports reflected that one car crashed into the hole at 5:14 a.m., that another vehicle also hit the hole at 5:14 a.m., that plaintiff struck the hole at 5:28 a.m., and that a fourth car drove into the hole at 5:29 a.m.

because of the confusing closure set up, that road commission personnel arrived, and that the personnel "made adjustments."

Plaintiff testified in her deposition that she was driving slower because of the construction in the general area, that she took the exit at issue, and that the next thing she knew was that the front of her car was at the bottom of a hole. She did not see the hole before impact and did not have the opportunity to take any evasive action. Plaintiff could not recall the placement of any barrels or barricades near the exit, and she did not see any exit-closed signs. Plaintiff testified that she observed a regular exit sign for westbound M-59; she did not see a sign for a "temporary" M-59 westbound exit. She stated that she did not see any construction vehicles or construction equipment in the area around the hole. Plaintiff observed two other cars in different parts of the same hole when she crashed. As she scurried to get out of her car out of fear that other cars might run into her vehicle before she got out, the fourth car plowed into another section of the hole.

Officer Gary Venet, who was one of the responding police officers, testified in his deposition that "it wasn't clear that . . . the road was - - that that lane was closed." Venet further testified that, to the best of his memory, "the barrels were spaced a little too far apart, and that there wasn't a sign specifically indicating that the exit was closed." Sergeant Philip Abdoo, who also responded to the accident scene, testified that the hole was about the width of one lane and probably six to seven feet deep. Abdoo also indicated that "[t]he road was marked with barrels. However, it was somewhat confusing where the barrels meant to direct traffic." Documents from the road construction company, we presume Carlo, contained a foreman's diary, which provided:

> Note that even after we put type III barricades up at the EB off ramp for WB Hall two cars still managed to drive into the open hole where we pulled the concrete for the pipe crossing at sta. 997+00. Leo from MDOT called to tell me and we had to re-adjust the barricades again to try and keep traffic out!! Note that Leo himself drove into the corner of this proposed pipe crossing and he ended up in the ditch, and he knew it was there but wasn't watching where he was going[.]

Another document from the company included an entry by a different company foreman, who stated as follows:

> U/G crews working on EB storm sewer X-ings . . . from north of RR to 23 Mi. Rd. There was confusion with traffic overnight after [workers] removed pavement for these X-ings. Traffic was used to using the long deceleration lane from EB I-94 to WB M-59 and 4 cars came through the closure into the pavement removal area. Removals finish up at 4:00 AM with U/G crews starting at 6:30 AM.

It thus appears that the construction hole at issue was cut or excavated at or before 4:00 a.m., with the accidents occurring a little more than an hour later.

Gordon Wall, a safety manager who worked for Carlo, testified that the police contacted MDOT after the accidents and that an MDOT inspector contacted Carlo regarding the need for more barrels. Arnold Beller, an MDOT employee, made the following comments in a daily report: "Accident at 5:00 am on EB I94 @ M59 WB off Ramp. 4 cars came behind the lane closure into the closed lane and ran off into the open pavement patching area." Plaintiff also submitted an affidavit from Thomas Maleck, Ph.D., who averred and opined that the "accident occurred in the active roadbed designed for vehicular traffic," that the hole "constituted a defect," that the defect "was within the active roadbed designed

for vehicular travel," and that "the defect . . . falls within the highway exception to governmental immunity."

At oral argument on the motion for summary disposition, MDOT's counsel, on questioning by the trial court, conceded that there was no sign indicating that the exit taken by plaintiff and the other drivers was closed to traffic. We note that the parties agree that there was a temporary exit sign for westbound M-59 *located further down eastbound I-94 and past the exit at issue* that was intended to direct motorists to an alternate exit that could be taken to access westbound M-59 for those drivers who would have ordinarily used the earlier "closed" exit. The trial court took the motion for summary disposition under advisement and subsequently issued a written opinion and order. The court denied defendant's motion for summary disposition and granted, under MCR 2.116(I)(2), partial summary disposition in favor of plaintiff with respect to the issue of governmental immunity. The trial court reasoned:

> It is true that a dispute over the mere placement of traffic signs will not be sufficient for plaintiff to invoke the "highway exception" to MDOT's immunity from tort liability because such signs are not typically in the roadbed itself. . . . Contrary to MDOT's position, however, this is not a situation in which mere sign placement is involved. Instead, the instant controversy involves the overall sufficiency of warnings in the roadbed itself.
>
> The primary issue is whether MDOT had closed the subject area of the highway. If MDOT had done so, then its duty under MCL 691.1402(1) to keep the highways in reasonably good repair and fit for public travel would have been suspended [under *Grounds v Washtenaw Co Rd Comm*, 204 Mich App 453; 516 NW2d 87 (1994)], which, in turn, means that MDOT would not be subject to tort liability under the "highway exception," but instead would be immune from such liability under MCL 691.1407(1). As

addressed above, the evidence shows that there was a great deal of confusion as to whether the area containing the hole was actually closed. Unlike the situation in *Grounds, supra,* there is no evidence of a sign that clearly and specifically marked the area as closed to traffic. Neither were there any flashing arrows or detour signs. Significantly, the area was confusing to several other drivers, including an MDOT employee, all of whom also drove into the hole. Even law enforcement personnel express[ed] confusion as to whether the area was closed. Contrary to MDOT's assertion, this dispute does not merely involve the proper spacing of the orange cones, but also involves the lack of other warning devices. Under the totality of [the] circumstances, it was not clear that the area was in fact closed to traffic. Therefore, it cannot be concluded that MDOT's duty under MCL 691.1402(1) was suspended. In turn, this means that plaintiff may pursue her tort claim against MDOT under the "highway exception" to governmental immunity.

Accordingly, MDOT is not entitled to summary disposition pursuant to MCR 2.116(C)(7). . . . Moreover, plaintiff's motion for partial summary disposition should be granted pursuant to MCR 2.116(I)(2) as to the issue of governmental immunity since MDOT is not immune from tort liability.[6]

Defendant MDOT appeals as of right the trial court's ruling.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND SUMMARY DISPOSITION TESTS

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Loweke v Ann Arbor*

---

[6] We note that plaintiff did not actually file a motion for partial summary disposition. However, under MCR 2.116(I)(2), "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party."

*Ceiling & Partition Co, LLC,* 489 Mich 157, 162; 809 NW2d 553 (2011); *In re Egbert R Smith Trust,* 480 Mich 19, 23; 745 NW2d 754 (2008). Further, the determination regarding the applicability of governmental immunity and a statutory exception to governmental immunity is a question of law that is also subject to review de novo. *Co Rd Ass'n of Mich v Governor,* 287 Mich App 95, 117-118; 782 NW2d 784 (2010); *Robinson v City of Lansing,* 282 Mich App 610, 613; 765 NW2d 25 (2009), rev'd on other grounds 486 Mich 1 (2010). Indeed, we review de novo questions of law in general, including matters of statutory construction. *Loweke,* 489 Mich at 162; *Feyz v Mercy Mem Hosp,* 475 Mich 663, 672; 719 NW2d 1 (2006); *Byker v Mannes,* 465 Mich 637, 643; 641 NW2d 210 (2002).

Under MCR 2.116(C)(7), an order granting a motion for summary disposition in favor of a defendant is proper when the plaintiff's claim is "barred because of . . . immunity granted by law . . . ." See *Odom v Wayne Co,* 482 Mich 459, 466; 760 NW2d 217 (2008). The moving party may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible. *Id.* The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. *Id.* This Court must consider the documentary evidence submitted for purposes of a motion brought under MCR 2.116(C)(7) relative to governmental immunity in a light most favorable to the nonmoving party. *Herman v Detroit,* 261 Mich App 141, 143-144; 680 NW2d 71 (2004). If there is no relevant factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. *Huron Tool & Engineering Co v Precision Consulting Servs, Inc,* 209 Mich App 365, 377; 532 NW2d 541 (1995). If, however, a pertinent factual dispute exists, summary disposition is not appropriate. *Id.*

### B. GENERAL PRINCIPLES—STATUTORY INTERPRETATION

This appeal entails, in part, an issue of statutory construction. In *McCormick v Carrier*, 487 Mich 180, 191-192; 795 NW2d 517 (2010), the Michigan Supreme Court recited the familiar principles that guide our interpretation of a statute:

> The primary goal of statutory construction is to give effect to the Legislature's intent. This Court begins by reviewing the language of the statute, and, if the language is clear and unambiguous, it is presumed that the Legislature intended the meaning expressed in the statute. Judicial construction of an unambiguous statute is neither required nor permitted. When reviewing a statute, all non-technical words and phrases shall be construed and understood according to the common and approved usage of the language, MCL 8.3a, and, if a term is not defined in the statute, a court may consult a dictionary to aid it in this goal. A court should consider the plain meaning of a statute's words and their placement and purpose in the statutory scheme. Where the language used has been subject to judicial interpretation, the legislature is presumed to have used particular words in the sense in which they have been interpreted. [Citations and quotation marks omitted.]

This Court must avoid a construction that would render any part of a statute surplusage or nugatory. *Zwiers v Growney*, 286 Mich App 38, 44; 778 NW2d 81 (2009). We may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself. *Id.*

### C. GENERAL PRINCIPLES—GOVERNMENTAL IMMUNITY

Except as otherwise provided, the GTLA broadly shields and grants immunity to governmental agencies from tort liability when an agency is engaged in the exercise or discharge of a governmental function. MCL

691.1407(1); *Duffy v Dep't of Natural Resources*, 490 Mich 198, 204; 805 NW2d 399 (2011); *Grimes v Dep't of Transp*, 475 Mich 72, 76-77; 715 NW2d 275 (2006). "The existence and scope of governmental immunity was solely a creation of the courts until the Legislature enacted the GTLA in 1964, which codified several exceptions to governmental immunity that permit a plaintiff to pursue a claim against a governmental agency." *Duffy*, 490 Mich at 204. A governmental agency[7] is potentially liable under the GTLA only if the case against it falls into one of these enumerated statutory exceptions to governmental immunity. *Grimes*, 475 Mich at 77; *Stanton v Battle Creek*, 466 Mich 611, 614-615; 647 NW2d 508 (2002). An activity that is expressly or impliedly authorized or mandated by constitution, statute, local charter, ordinance, or other law constitutes a governmental function. *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 613-614; 664 NW2d 165 (2003). This Court gives the term "governmental function" a broad interpretation, but the statutory exceptions must be narrowly construed. *Id.* at 614. "A plaintiff filing suit against a governmental agency must initially plead his claims in avoidance of governmental immunity." *Odom*, 482 Mich at 478-479.

The highway exception to governmental immunity, MCL 691.1402, provides, in pertinent part:

(1) Except as otherwise provided in section 2a, each governmental agency having jurisdiction over a highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel. A person who sustains bodily injury or damage to his or her property by reason of failure of a governmental agency to keep a highway under its jurisdiction in reasonable repair

---

[7] The state of Michigan is a governmental agency for purposes of the GTLA, MCL 691.1401(d), and this includes its departments such as MDOT, MCL 691.1401(c). See *Duffy*, 490 Mich at 204 n 2.

and in a condition reasonably safe and fit for travel may recover the damages suffered by him or her from the governmental agency. . . . *The duty of the state and the county road commissions to repair and maintain highways, and the liability for that duty, extends only to the improved portion of the highway designed for vehicular travel and does not include sidewalks, trailways, crosswalks, or any other installation outside of the improved portion of the highway designed for vehicular travel.* [Emphasis added.]

A "highway" is statutorily defined as "a public highway, road, or street that is *open for public travel* and includes bridges, sidewalks, trailways, crosswalks, and culverts on the highway." MCL 691.1401(e) (emphasis added). MCL 691.1402(1) and MCL 691.1401(e) must be read together as a single law, and when they "are read *in pari materia*, it is clear that all governmental agencies have a duty to maintain highways within their jurisdiction in reasonable repair, but that this duty only extends to 'highways' that fall within the definition of 'highway' in MCL 691.1401(e)." *Duffy*, 490 Mich at 207.

In regard to the state and county road commissions under the highway exception, the statutory language creates a duty to maintain a highway solely with respect to the traveled portion, paved or unpaved, of the roadbed actually designed for vehicular travel by the public. *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 180; 615 NW2d 702 (2000); *Grimes*, 475 Mich at 79. "[I]f the condition is not located in the actual roadbed designed for vehicular travel, the narrowly drawn highway exception is inapplicable and liability does not attach." *Nawrocki*, 463 Mich at 162; see also *Grimes*, 475 Mich at 79. Our Supreme Court has clearly stated that allegations concerning a lack of warning and traffic-control devices, or allegations of design defects, do not implicate the highway exception and the government's duty to repair and maintain a highway. *Hanson v*

*Mecosta Co Rd Comm'rs*, 465 Mich 492, 499; 638 NW2d 396 (2002); *Nawrocki*, 463 Mich at 183-184.

### D. MDOT'S APPELLATE ARGUMENTS

MDOT first argues that the trial court erroneously ruled that governmental immunity was inapplicable under the highway exception, because there was no dispute that plaintiff's claims solely involved the alleged inadequacy of traffic-control devices and barricades, which do not in any way involve the improved portion of a highway designed for vehicular travel. In addition, according to MDOT, the trial court's ruling was in error because there was no dispute that the area where the hole was located was neither designed nor intended for vehicular traffic, given that it was closed during ongoing construction activities. Finally, as an alternative argument, MDOT maintains that the trial court erroneously granted partial summary disposition in favor of plaintiff on the issue of governmental immunity, because there were, at the very least, genuine issues of material fact concerning whether the exit lane was closed at the time of the accident.

### E. HOLDING AND DISCUSSION

We hold that the trial court properly denied MDOT's motion for summary disposition, albeit for reasons slightly different from those expressed by the court. We initially note that there is no dispute that MDOT was engaged in the exercise or discharge of a governmental function; therefore, immunity would shield MDOT absent application of the highway exception. With respect to the highway exception and its limitation that the state's duty, and the liability for that duty, extends only to the "improved portion of a highway," MCL 691.1402(1), we conclude that the condition or hazard

that must be examined is the construction hole in the exit lane for purposes of determining whether this case concerned an improved portion of a highway. The excavated hole was the direct proximate cause of the accident; but for the construction hole, there would be no crash or resulting damages. And the roadbed of the exit lane wherein the hole was located is indisputably part of "the improved portion of the highway" and not an "installation outside of the improved portion of the highway . . . ." MCL 691.1402(1).[8] Furthermore, it cannot reasonably be disputed that the exit lane had been "designed for vehicular travel," MCL 691.1402(1). Indeed, the very purpose of designing and constructing the exit lane was to provide an avenue by which vehicles could travel off the main highway and head toward a different destination. Accordingly, and generally speaking, MDOT had a duty under MCL 691.1402(1) to maintain the exit lane "in reasonable repair so that it [was] reasonably safe and convenient for public travel." However, we must also contemplate the impact of construction activities on MDOT's duty, and this issue necessarily entails consideration of whether the exit lane could properly be deemed a "highway" at the time of the accident under the statutory definition of "highway" in MCL 691.1401(e), which required the exit lane to be "open for public travel . . . ." This is the part of the analysis where the traffic-control devices, i.e., orange barrels, signs, markers, and barricades, become relevant.

Traffic-control devices generally indicate whether or not a road is "open for public travel." Matters concern-

---

[8] At this juncture in our analysis, we are proceeding on the assumption that the exit lane fits the definition of a "highway" under MCL 691.1401(e). That issue, however, will be explored in detail later in this opinion.

ing the traffic-control devices here cannot be viewed or examined in a vacuum and must necessarily be considered in conjunction with, and not independent of, the construction hole in the exit lane. If the exit lane was effectively open for public travel and not closed as reflected by traffic-control devices, MDOT's duty to keep the exit lane reasonably safe for public travel would be implicated.[9] MDOT argues that it is beyond rational dispute that the exit lane was in fact closed for public travel given the construction activities and the placement of orange barrels. We shall later discuss the issue concerning whether the exit lane was open or closed for public travel as indicated by the barrels and

---

[9] We note that, assuming the existence of a duty, the placement of traffic-control devices would also be relevant to the issue whether the excavation and presence of the construction hole constituted a breach of the duty to maintain the exit lane in reasonable repair, or, stated otherwise, whether MDOT was negligent. "[T]ort actions against governmental agencies generally raise two separate issues: 1) whether the plaintiff has pleaded a cause of action in avoidance of governmental immunity, and 2) whether the plaintiff can establish the elements of a negligence action." *Glancy v City of Roseville*, 457 Mich 580, 588; 577 NW2d 897 (1998) (noting that actionable negligence relates to a failure to keep a highway in reasonable repair). There is some natural overlap in this case between the issue of negligence and the applicability of the highway exception in relationship to the traffic-control devices. MCL 691.1402(1) and MCL 691.1401(e) make it relevant in determining the applicability of the highway exception whether a highway was open for public travel, thereby requiring consideration of traffic-control devices, and, if indeed the highway was open, resolution of MDOT's negligence would turn, in part, on any negligent conduct in placing the traffic-control devices in such a manner that they effectively allowed the exit lane to remain open, thereby making the construction hole a true defect in the roadbed. It is possible that presumed inadequate traffic-control devices may have existed because of circumstances beyond MDOT's blameworthiness in tort, e.g., perhaps other vehicles recently knocked down some barrels or vandals removed an "exit closed" sign. And it is also possible that a jury could allocate fault, in whole or in part, to contractor Carlo or others. The question of negligence is outside the scope of this appeal.

other traffic-control devices. Setting aside for the moment consideration of the barrels with regard to the determination whether the exit lane was open for public travel, we do not find that the construction activities, in and of themselves, support a conclusion that the exit lane was closed. Assuming a motorist could observe from a distance that construction was ongoing on part of a highway that he or she wished to use, the motorist could still reasonably proceed to drive through the construction zone if there were no signs or traffic-control devices indicating a closure, given that roadways through construction zones often remain open, although there might be some limitations, e.g., only one lane available. A road is not necessarily closed for public travel simply because construction work is being performed in the area. We acknowledge that there are situations in which a construction project so blatantly blocks any potential use of a roadway that a reasonable motorist would certainly understand and appreciate that the roadway was fully closed, even in the absence of any signage or traffic-control devices. For purposes of analyzing the applicability of the highway exception to governmental immunity, we conclude that the appropriate test for determining whether a road is open for public travel is whether a reasonable motorist, under all the circumstances, would believe that the road was open for travel.[10] It would be nonsensical to conclude that a road was closed for public travel in circumstances in which a motorist had no notice that construction

---

[10] On the possibility that plaintiff had not planned to use the exit but did so only because she believed that the orange barrels were temporarily directing her off the main highway because of construction, the test would be framed in terms of determining whether a reasonable motorist would have believed that he or she was required to exit the highway, which would indicate to the motorist that the exit lane had to be open for use.

activities precluded the safe use of the road, making evasive action difficult or impossible.

With its focus placed chiefly on the traffic-control devices, MDOT's position in this appeal essentially ignores the fact that a construction hole existed in the roadbed of the exit lane. Again, the issue concerning the traffic-control devices cannot be considered in isolation; rather, it affects the questions whether the exit lane was open for public travel and whether MDOT was negligent, both of which questions relate to the construction hole. The traffic-control devices would be entirely irrelevant if the exit lane had no construction hole. It is true that plaintiff's allegations in her complaint focused heavily on MDOT's management and handling of the traffic-control devices. But plaintiff also alleged that her "injuries were the direct and proximate result of the negligence of . . . MDOT and the defective, unsafe and confusing barricading of the *construction hole dug in and at this highway exit lane, which was not obvious to approaching traffic and created a point of special danger.*" (Emphasis added.) MDOT argues that "[e]ven assuming the road was not properly barricaded, this has nothing whatsoever to do with governmental immunity." This argument fails to take into consideration the presence of the construction hole. If there were absolutely no barricades blocking access to the exit lane and a complete absence of signage indicating a closure, one would simply have a case where a motorist struck a major defect in the exit lane and the case would easily fit within the parameters of the highway exception.

We observe that almost any defective condition in a roadbed could be viewed as creating some type of duty to warn the public of the condition through signage, markers, barrels, or other traffic-control devices. For example, if part of the roadbed of a bridge or overpass

had become dilapidated to the point that a motor vehicle could not safely traverse the bridge without the danger of crashing to the ground below, and a vehicle did in fact so crash where there was a complete absence of any warnings about the roadbed defect, it might be argued that governmental immunity applied without implicating the highway exception. In that scenario, although the improved portion of the highway, or roadbed, would indisputably be defective, a subsequent suit would likely entail, to some degree or in some fashion, allegations of a negligent failure to employ traffic-control devices. The same could be said for a case that simply involved a large, dangerous pothole that caused an accident, with a defendant arguing that the strategic placement of a barrel would have mitigated the danger and thus the resulting lawsuit would in essence be an action concerning traffic-control devices. We, however, do not find that these hypothetical situations would justify granting immunity, where the fact remained that the cases ultimately concerned a roadbed condition that proximately caused damages. The case sub judice is *not* a case where we are merely talking about, for example, negligence in failing to repair a malfunctioning stoplight that leads to a crash in an intersection; we have the added element and involvement of a roadbed condition that was ultimately the cause of the crash.

We shall now turn our attention to the cases cited and relied on by the parties, which we find are entirely consistent with our approach, reasoning, and analysis. In *Nawrocki*, the plaintiff was injured in a motor vehicle accident at an intersection when his car and another vehicle collided. The plaintiff sued the defendant, alleging that the defendant "owed him a duty to install additional stop signs or traffic signals at the intersec-

tion." *Nawrocki*, 463 Mich at 154.[11] The issue addressed
by the Court was whether, under the highway exception
to governmental immunity, "the state or a county road
commission ha[d] a duty to install, maintain, repair, or
improve traffic control devices, including traffic signs."
*Id.* at 173. The Court held that the highway exception
did not contemplate conditions arising from points of
hazard, areas of special danger, or integral parts of a
highway that were outside the actual roadbed, whether
paved or unpaved, designed for vehicular travel. *Id.* at
176-177. Further, our Supreme Court elaborated and
ruled:

> The state and county road commissions' duty, under the
> highway exception, is only implicated upon their failure to
> repair or maintain the actual physical structure of the
> roadbed surface, paved or unpaved, designed for vehicular
> travel, which in turn proximately causes injury or damage.
> A plaintiff making a claim of inadequate signage, like a
> plaintiff making a claim of inadequate street lighting or
> vegetation obstruction, fails to plead in avoidance of gov-
> ernmental immunity because signs are not within the
> paved or unpaved portion of the roadbed designed for
> vehicular travel. Traffic device claims, such as inadequacy
> of traffic signs, simply do not involve a dangerous or
> defective condition in the improved portion of the highway
> designed for vehicular travel.

> [The plaintiff] argues that the [defendant] failed to
> install additional traffic signs or signals that might con-
> ceivably have made the intersection safer. Because the
> highway exception imposes no such duty on the state or
> county road commissions, we reverse the decision of the

---

[11] We note that the *Nawrocki* opinion involved two consolidated appeals
of separate cases with distinct factual backgrounds. *Nawrocki*'s compan-
ion case was *Evens v Shiawassee Co Rd Comm'rs.* Our discussion here
pertains to the Michigan Supreme Court's review of the facts, its
analysis, and the Court's holding with respect to *Evens*, but for reasons
of clarity and to avoid confusion, we shall simply make reference to
*Nawrocki* for citation purposes.

Court of Appeals and reinstate the trial court's grant of
summary disposition to the [defendant]. [*Id.* at 183-184
(citation omitted).]

Here, there can be no reasonable dispute that, ulti-
mately, the point of hazard or area of special danger was
the construction hole in the actual roadbed of the exit
lane. While this case involves in part a claim of inad-
equate traffic signage and control devices, it *also* in-
volves an allegedly dangerous or defective condition in
the improved portion of the highway that proximately
caused injury or damage, which condition must be
examined in the context of and in relationship to the
adequacy of traffic-control devices.

In its discussion, the *Nawrocki* Court overruled *Pick
v Szymczak*, 451 Mich 607; 548 NW2d 603 (1996), on
the basis that *Pick* would have plausibly and improperly
allowed a plaintiff to argue the following:

— there should have been yield signs along a highway
   instead of no signs;
— there should have been stop signs along a highway
   instead of yield signs;
— there should have been a flashing yellow/red traffic
   light along a highway instead of stop signs;
— there should have been a fully functional
   red/yellow/green traffic signal along a highway instead
   of a flashing yellow/red light;
— there should have been an overpass above a highway,
   thus eliminating the need for traffic signals altogether;
— there should have been a 25 MPH sign, instead of a 30
   MPH sign, nearing an approach to an intersection; or
— there should have been a left turn lane where none
   existed. [*Nawrocki*, 463 Mich at 178.]

Under *Nawrocki*, these hypothetical scenarios do not
implicate the highway exception because they do not

concern a condition relative to the improved portion of a highway designed for vehicular travel. None of them, however, can be analogized to the factual situation here, because they do not entail the added element of a roadbed condition or hazard that proximately caused injuries. *Nawrocki* is entirely consistent with our proffered analysis above and does not demand a contrary result, since the case at bar encompasses a condition concerning the improved portion of a highway—the construction hole.

In *Grimes*, 475 Mich at 73, the Michigan Supreme Court framed the issue there as whether, for purposes of the highway exception to governmental immunity, the shoulder of a highway was part of the improved portion of the highway designed for vehicular travel. The Court held:

> We believe that, taken as a whole, the language of the highway exception supports the view that a shoulder, unlike a travel lane, is not designed for vehicular travel. Consequently, we adopt a view of "travel" that excludes the shoulder from the scope of the highway exception. Thus, we hold that only the travel lanes of a highway are subject to the duty of repair and maintenance specified in MCL 691.1402(1).
>
> Also, our decision is consistent with *Nawrocki*. . . . [O]ur determination that the shoulder is not designed for vehicular travel reinforces *Nawrocki's* reading of the highway exception that it encompassed only the " 'traveled portion, paved or unpaved, of the roadbed actually designed for public vehicular travel.' " [*Grimes*, 475 Mich at 91.]

Other than reiterating the principles from *Nawrocki*, the opinion in *Grimes* does not play a significant relevant role in deciding our case. It does support our earlier proposition that the exit lane had been designed for vehicular travel.

This Court's decision in *Grounds*, 204 Mich App 453, addressed the issue of a closed roadway and its effect on the duty to maintain the roadway in a safe condition. It is a rather short opinion; therefore, we shall quote it in full, omitting some of the general principles on governmental immunity and statutory language that we have already alluded to above:

> These consolidated actions arise from an automobile accident that occurred at the intersection of Stoney Creek Road and Platt Road in Washtenaw County on November 10, 1987. Cynthia Kimble was traveling east and Calvin Grounds was traveling west on Stoney Creek Road. At that time Stoney Creek was undergoing repairs. There were eight-foot-wide barricades in the middle of Stoney Creek on both sides of the intersection with signs warning motorists that the road was closed to through traffic. Both Cynthia Kimble and Nancy Grounds, the personal representative of the estate of Calvin Grounds, brought suit against defendant, alleging that defendant's negligent placement of the barricades caused the accident.
>
> Defendant filed a motion for summary disposition with respect to each plaintiff under MCR 2.116(C)(8) and (C)(10), alleging that it had no statutory duty to plaintiffs because Stoney Creek Road was not open to public travel. Following a hearing on the motion, the court granted summary disposition in favor of defendant. Plaintiffs now appeal as of right. We affirm.

\* \* \*

> The key issue here is whether the highway exception to governmental immunity applies when the road is undergoing repairs or reconstruction and has been marked as "closed to through traffic." We find that it does not.
>
> Our Supreme Court has held that a governmental agency may suspend its duty to keep the streets in good repair and fit for public travel while the street is being improved or repaired by closing to public traffic that portion of the street. *Southwell v Detroit*, 74 Mich 438; 42

NW 118 (1889), *Beattie v Detroit*, 137 Mich 319; 100 NW 574 (1904), and *Speck v Bruce Twp*, 166 Mich 550; 132 NW 114 (1911). Here, the road was marked by eight-foot barricades as being closed to through traffic while repairs and improvements were being made. We find this was sufficient to suspend the statutory exception to governmental immunity.

In their briefs on appeal, plaintiffs discuss at great length whether plaintiff Kimble had a right to use the road; we find that question to be irrelevant to our holding. [*Grounds*, 204 Mich App at 454-456.]

It is abundantly clear that Stoney Creek Road was, in general, closed because of construction and that traffic-control devices adequately indicated the closure, since the road was expressly marked closed to through traffic and huge barriers were in place. More importantly, the *Grounds* panel specifically ruled that the highway exception to governmental immunity was suspended because "the road *was marked by eight-foot barricades as being closed* to through traffic while repairs and improvements were being made." *Id.* at 456 (emphasis added). In that same vein, the Court also indicated that a governmental agency may suspend its duty to keep a street in good repair and fit for travel by the public while the street is under construction "*by closing* to public traffic that portion of the street." *Id.* (emphasis added). Accordingly, a highway is not open for public travel when the government "closes" the highway and "marks" it as being closed, which would typically entail the use of adequate traffic-control devices. Therefore, *Grounds* is consistent with our analysis, and it negates any stance that, for purposes of analyzing the highway exception, a road is not open for public travel simply because it is under construction and regardless of whether it is sufficiently marked as being closed by the governmental agency.

A case relied on by MDOT is *Pusakulich v City of Ironwood*, 247 Mich App 80; 635 NW2d 323 (2001), wherein the plaintiff sustained injuries when she fell on an allegedly defective city sidewalk that was adjacent to a street that was temporarily closed for repairs to a water line running underneath the street. The plaintiff alleged that "a slab of the sidewalk was missing, the area filled with water, and the area was unmarked and unlit." *Id.* at 81. She fell while attempting to jump over the hole that she believed was simply a puddle on the sidewalk. *Id.* The *Pusakulich* panel affirmed the grant of summary disposition in favor of the defendant city, but only because it believed that it was required to do so under prior precedent. *Id.* This Court stated:

> We recognize that the status of a sidewalk for purposes of governmental immunity depends on whether the adjacent highway is covered by the exception. MCL 691.1401(e). The highway in this case was temporarily closed. Because this Court previously determined . . . that temporary closure removed a street itself from the highway exception, those decisions necessarily also require us to conclude that any sidewalk connected with the temporarily closed highway is also removed from the highway exception along with the highway. In this case, Aurora Street was temporarily closed and, under the broad holding of *Grounds, supra,* that closure removed it from the highway exception to governmental immunity. Because the sidewalk on which plaintiff alleged that she sustained injuries was adjacent to this temporarily closed street, we are compelled . . . to conclude that it too was removed from the exception. Although we disagree with that conclusion, we reluctantly acknowledge that, under existing case law, the trial court properly granted summary disposition. [*Pusakulich*, 247 Mich App at 87 (citations omitted).]

We note that a special panel was not convened. *Pusakulich v City of Ironwood*, 247 Mich App 801 (2001).

As in *Grounds*, the panel in *Pusakulich* was addressing a situation in which there was no dispute that the road, and therefore its adjacent sidewalk, was temporarily closed. There is such a dispute in the case at bar. Neither *Grounds* nor *Pusakulich* contravene our analysis and instead they provide support for our holding, because they indicate that the duty to keep a highway in reasonable repair is suspended when the highway is effectively closed by authorities, with the necessary corollary being that the duty is still owed if the highway, despite undergoing construction, is not properly closed to the public.

Finally, it must be determined whether the trial court properly granted partial summary disposition in favor of plaintiff on the issue of governmental immunity. The trial court essentially found that the exit lane was open for public travel as a matter of law because it was not adequately marked as being closed; therefore, the highway exception applied and MDOT was not shielded by governmental immunity. MDOT argues that, minimally, there was a genuine issue of material fact regarding whether the exit lane was open for public travel. MDOT contends that it "submitted abundant documentary evidence in support of its position that the area was, in fact, closed and therefore governmental immunity applied." MDOT relies on the police crash reports that referenced "closed lanes" and "lane closures."

As indicated already, the applicability of governmental immunity and the highway exception turns on whether the exit lane, at the time of the accident, was open for public travel, which is determined on the basis of the observations of a reasonable motorist driving down I-94 at the time of the accident. Plaintiff did not recall seeing any barriers or traffic-control devices that directed her not to use the exit lane, and there is no

dispute that there were no signs indicating that the exit lane was closed. Three other drivers made the same "mistake" as plaintiff, and a couple of the police crash reports noted that, upon investigation, the placement of the construction barrels was confusing. And two of the reports also indicated that road commission personnel made adjustments to the traffic-control devices after the multiple accidents. Deposition testimony by responding police officers reflected that it was not clear that the exit lane was closed. The police officers' testimony further indicated that the orange barrels were spaced too far apart and that it was somewhat confusing with respect to what direction the barrels were directing I-94 traffic. Although it is somewhat unclear from the record of all the surrounding circumstances, even an inspector from MDOT drove into the hole.

MDOT relies on references to "closed lanes" and "lane closures" in the crash reports. Although we believe that little weight should be given to these descriptive references, there is evidence that orange barrels were indeed utilized and there were road construction documents indicating that type III barricades were put in place when the hole was cut in the exit lane. Additionally, heavy road construction activities throughout the exit lane area may have provided a reasonable motorist visual notice that the exit lane was closed to traffic regardless of the absence or adequacy of traffic-control devices. And the testimony and reports of the police officers did not declare that the exit lane definitively appeared open for travel. While a close call, we conclude that a genuine issue of material fact exists with respect to whether the exit lane was effectively open for public travel at the time of the accident, as based on the observations of a reasonable motorist driving down I-94. Accordingly, the trial court erred by granting partial summary disposition in favor of plain-

tiff on the basis that the highway exception applied as a matter of law. The applicability of the highway exception will be dependent on the trier of fact's finding regarding whether the exit lane was closed or open to public travel.

### III. CONCLUSION

We conclude that the relevant condition or hazard for purposes of determining the applicability of the highway exception was the construction hole itself, which proximately caused the accident and any resulting damages. Furthermore, we find, as a matter of law, that the exit lane's roadbed where the construction hole was located constituted an improved portion of the highway and that the exit lane had been designed for vehicular travel. We also hold that a genuine issue of material fact exists regarding whether the exit lane was closed or effectively remained open for public travel at the time of the accident, as gleaned by a reasonable motorist traveling along the pertinent section of highway. Accordingly, we affirm the trial court's ruling that denied MDOT's motion for summary disposition but we reverse the court's determination that plaintiff was entitled to partial summary disposition with respect to the applicability of the highway exception to governmental immunity.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full on appeal, we decline to award taxable costs under MCR 7.219.

FITZGERALD, J., concurred with MURPHY, C.J.

TALBOT, J. (*concurring*). Although I concur with the majority's ultimate ruling, I write separately because I

believe it unnecessary to suggest the existence of a new rule of law or test to reach this correct outcome.

Tracy Snead was driving her vehicle on eastbound I-94 near Hall Road, which was under construction. Snead drove onto an exit ramp where she encountered a large hole where the concrete had been removed in part of the exit lane. Snead's automobile was one of four vehicles that were involved in accidents at this location within a very short time. Her allegations against the Michigan Department of Transportation (MDOT) are that her injuries are the direct result of the defective, unsafe, and confusing manner in which the construction area was barricaded. MDOT contends that Snead's claims are barred by governmental immunity and it is entitled to summary disposition because the highway exception does not require signage to be placed in a construction area and the exception is inapplicable because the roadway was closed to traffic.

The highway exception to governmental immunity is statutory and provides:

> [E]ach governmental agency having jurisdiction over a highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel. A person who sustains bodily injury or damage to his or her property by reason of failure of a governmental agency to keep a highway under its jurisdiction in reasonable repair and in a condition reasonably safe and fit for travel may recover the damages suffered by him or her from the governmental agency. . . . The duty of the state and the county road commissions to repair and maintain highways, and the liability for that duty, extends only to the improved portion of the highway designed for vehicular travel and does not include sidewalks, trailways, crosswalks, or any other installation outside of the improved portion of the highway designed for vehicular travel.[1]

---

[1] MCL 691.1402(1).

The Legislature has defined a highway as "a public highway, road, or street that is open for public travel . . . ."[2] Because neither party disputes that MDOT is a governmental agency[3] that was engaged in a governmental function[4] at the time of the events comprising this matter, the focus of the analysis is on MDOT's duty to maintain the highway "in reasonable repair and in a condition reasonably safe and fit for travel . . . ."[5]

In asserting its entitlement to summary disposition, MDOT contends that Snead cannot demonstrate that it had a duty to provide warning signs or barriers since the duty owed to travelers is recognized by law to be very limited in scope.[6] Specifically MDOT notes:

> The first sentence of the statutory clause, crucial in determining the scope of the highway exception, describes the basic duty imposed on all governmental agencies, including the state, having jurisdiction over any highway: "[to] maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel." This sentence establishes the duty to keep the highway in reasonable repair. The phrase "so that it is reasonably safe and convenient for public travel" refers to the duty to maintain and repair. The plain language of this phrase thus states the desired outcome of reasonably repairing and maintaining the highway; it does not establish a second duty to keep the highway "reasonably safe."[7]

To the extent that Snead implies that MDOT had a duty to place warnings signs or barricades for safety pur-

---

[2] MCL 691.1401(e).

[3] MCL 691.1401(d).

[4] MCL 691.1401(f).

[5] MCL 691.1402(1).

[6] See *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143; 615 NW2d 702 (2000).

[7] *Id.* at 160 (citation omitted).

poses on the highway, her allegations cannot be sustained. Yet, while there is no affirmative duty to place barricades to designate a hazardous condition, the use and placement of barricades can serve as evidence of whether MDOT's duty to keep the highway in reasonable repair was suspended through the closure of the relevant portion of the highway. This Court has recognized decisions by our Supreme Court "that a governmental agency may suspend its duty to keep the streets in good repair and fit for public travel while the street is being improved or repaired by closing to public traffic that portion of the street."[8] As such, the trial court correctly identified that "[t]he primary issue is whether MDOT had closed the subject area of the highway." Contrary to the majority's opinion, this determination simply comprises a question of fact and does not necessitate the construction or imposition of a reasonable-person test.

As discussed by the trial court, in this case

"there is no evidence of a sign that clearly and specifically marked the area as closed to traffic. Neither were there any flashing arrows or detour signs. Significantly, the area was confusing to several other drivers, including an MDOT employee, all of whom also drove into the hole. Even law enforcement personnel expression [sic] confusion as to whether the area was closed. Contrary to MDOT's assertion, this dispute does not merely involve the proper spacing of the orange cones, but also involves the lack of other warning devices. Under the totality of [the] circumstances, it was not clear that the area was in fact closed to traffic.

---

[8] *Grounds v Washtenaw Co Rd Comm*, 204 Mich App 453, 456; 516 NW2d 87 (1994), citing *Southwell v Detroit*, 74 Mich 438; 42 NW 118 (1889), *Beattie v Detroit*, 137 Mich 319; 100 NW 574 (1904), and *Speck v Bruce Twp*, 166 Mich 550; 132 NW 114 (1911). See also *Pusakulich v Ironwood*, 247 Mich App 80, 85-86; 635 NW2d 323 (2001).

Because of the existence of this question of fact regarding whether the roadway was closed or open to traffic, the trial court correctly ruled that MDOT was not entitled to summary disposition based on governmental immunity. The error committed by the trial court was the granting of partial summary disposition in favor of Snead on the issue of governmental immunity because the overriding question of whether the roadway was open or closed comprised a factual determination for the trier of fact.